UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------X
MIGUEL RIVERA,                          :
                                        :
                 Petitioner,            :
                                        :
          - against -                   :
                                        :
J. COLLADO, Superintendent of the       :
Shawangunk Correctional Facility,       :
                                        :
                 Respondent.            :
---------------------------------------------------X

19-CV-11403 (RWL)

**DECISION AND ORDER:
HABEAS PETITION**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/16/2021

**ROBERT W. LEHRBURGER**, **United States Magistrate Judge.**

Miguel Rivera ("Petitioner"), proceeding pro se, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction for Assault in the First Degree following a jury trial in New York State Supreme Court, Bronx County. Petitioner contends that: (1) the trial court erred in not suppressing identification by a witness who had been subject to an unduly suggestive procedure by police; (2) the trial court improperly admitted a 911 call; (3) the trial court failed to excuse jurors who briefly encountered Petitioner in a courthouse elevator; (4) his sentence was unduly harsh and excessive; and (5) the prosecution failed to meet its burden of proof, or, in the alternative, the verdict was against the weight of the evidence. The first three claims are without merit. The last two claims are both barred from habeas review and without merit. Accordingly, for the reasons set forth below, the petition is DENIED and the case DISMISSED.

1

**Background**

**A.    The Crime and Subsequent Events**

**1.    Petitioner Rivera Slashes Victim Maryidres Rivera**

On the night of February 28, 2009, witness and complainant Maryidres Rivera attended a birthday celebration held in her honor at the apartment of her sister, Marta Aviles.[1] (Tr. 127-29.[2])  Another sister, Yasmin Ruiz, and others were also in attendance. (Tr. 37, 128-29.)   At some point in the evening, Aviles called her then-boyfriend, Petitioner.  (Tr. 130-31.)   When Petitioner arrived outside of the apartment building, Aviles asked Victim Rivera to tell Petitioner that she was in the hospital, not at home. (Tr. 131.)   Victim Rivera proceeded downstairs, through the lobby, and went outside. (Tr. 132-34.)  Ruiz, already in the lobby, proceeded outside around the same time as Victim Rivera.  (Tr. 72.)  Victim Rivera's nephew Gledy Campos was likewise outside of the apartment building.  (Tr. 42-43.)

While outside, Petitioner and Victim Rivera engaged in a brief verbal altercation. Victim Rivera noticed the smell of alcohol on Petitioner's breath.  They spat at, but not on, each other.  Victim Rivera told Petitioner to leave, and Petitioner did so.  (Tr. 134-36.)

Shortly thereafter, Petitioner returned, approaching Campos while reaching to the right side of his leg and pulling out a boxcutter.  (Tr. 138-40.)  Victim Rivera placed herself between Campos and Petitioner, at which point Petitioner cut her three times:

---

[1] Because both Petitioner and the victim share the same last name, the Court uses the terms "Petitioner" and "Victim Rivera" to identify them respectively.   There is no apparent familial relation between the two.

[2] "Tr." refers to the transcript of Petitioner's jury trial before the New York State Supreme Court, Bronx County (Dkt. 39).

once across her right breast, once on her left arm, and once on her left side.  (Tr. 152-53, 161.)  Petitioner then pushed Victim Rivera against a nearby pole, causing her to sustain an additional bruise.  (Tr. 160-61.)  Petitioner then returned to his car and drove away.  (Tr. 47, 143.)

### 2.      911 Call

After the attack, Ruiz took Victim Rivera inside and placed a 911 call.  (Tr. 48-50.)   After being asked what happened, Ruiz told the dispatcher that her sister's boyfriend, meaning Petitioner, had cut Victim Rivera.  (Tr. 119; Call Supp. Hr'g 7.[3]) Victim Rivera was then taken to St. Barnabas Hospital.  (Tr. 304.)

### 3.      Hospital Visit and Extent of Wounds

At the hospital, Dr. Blanca Grand, who later testified during the trial as an expert witness, treated Victim Rivera.  (Tr. 297, 304.)   Dr. Grand treated Victim Rivera's injuries by giving her left upper back, right breast, and left forearm twelve, eight, and three sutures, respectively.  (Tr. 305-06.)  Victim Rivera later developed an infection following removal of her stitches. (Tr. 238.)  At the time of the trial, she still bore visible scarring on her forearm and breast and had endured pain while trying to breastfeed her child.  (Tr. 161-63.)

---

[3] Dkt. 37 contains the transcripts of three proceedings related to Petitioner's jury trial before the New York State Supreme Court, Bronx County, including a *Rodriguez* Hearing ("*Rodriguez* Hr'g"), a Suppression Hearing ("Supp. Hr'g"), and a Call Suppression Hearing ("Call Supp. Hr'g").  The *Rodriguez* Hearing and Suppression Hearing transcripts form a single, ninety-nine-page transcript titled "Hearing."  The Call Suppression Hearing transcript follows and is a twelve-page transcript titled "Motion."

**B.      Trial**

**1.      Pre-Trial Proceedings:  Witness Identification and 911 Call**

Prior to trial, the court conducted a *Rodriguez* hearing, relying upon the testimony

of Detective Glenn Godino.[4]  (*Rodriguez* Hearing ("*Rodriguez* Hr'g"), Dkt 37, 4.)  Godino

testified that he used a confirmatory identification procedure consisting of showing a

single photo to Victim Rivera.  (*Rodriguez* Hr'g 8.)   The court ultimately ruled that

Detective Godino's testimony was insufficient and ordered a suppression hearing as a

result.  (*Rodriguez* Hr'g 41.)

During the suppression hearing, Victim Rivera testified that she knew Petitioner

from when "he used to go out with [her] sister Martha Aviles."  (Suppression Hearing

("Supp. Hr'g"), Dkt. 37, 48.)  On direct examination, Victim Rivera testified that she first

met Petitioner at her sister's apartment in January 2009, remaining in the same room as

him for no more than twenty minutes.  (Supp. Hr'g 49.)  She also testified that she met

Petitioner a second time while he and her sister Aviles were in a car together, for a

similar period of time, and later that same day observed Petitioner and Aviles in the car

together.  (Supp. Hr'g 50-52.)  Victim Rivera identified the person who she spat at, and

who spat at her, as the person she had been introduced to before, i.e., Petitioner.

(Supp. Hr'g 54-55.)  Victim Rivera then testified that before she was attacked, she was

less than an arm's length away from Petitioner.  (Supp. Hr'g 57-58.)  She also described

the area of the attack as "bright," identifying lights from a nearby train station and Aviles'

---

[4] A *Rodriguez* hearing is held to determine whether a suggestive police identification procedure is "merely confirmatory," which means the victim "knew defendant so well that no amount of police suggestiveness could possibly taint the identification."  *People v. Rodriguez*, 79 N.Y.2d 445, 447, 453, 583 N.Y.S.2d 814, 815, 820 (1992).

apartment building as sources of illumination.  (Supp. Hr'g 55-56.)  She concluded by making an in-courtroom identification of Petitioner.  (Supp. Hr'g 61-62.)

On cross examination, Victim Rivera testified that she had seen Petitioner in January at her sister's apartment because she had picked up her nephew to take him to a test.  (Supp. Hr'g 73.)  She also testified that she had not given police an oral description of Petitioner's height, but had indicated his height with her hand.  (Supp. Hr'g 75.)  Following cross examination, the trial court denied Petitioner's motion to suppress.  (Supp. Hr'g 99.)

Prior to trial, the court also held a brief hearing on whether the 911 call Ruiz made could be admitted as an exception to the rule against hearsay.  (Call Supp. Hr'g 9.)  The court ruled that it could be introduced under the excited utterance exception because "[t]he caller sounds hysterical.  Indeed the operator repeatedly told the caller to calm down … Clearly, this was an emergency."  (Call Supp. Hr'g 2-4, 9.)  The court also cited supporting case law.  (Call Supp. Hr'g 2-3.)

### 2. Testimony at Trial

Three witnesses testified at the trial – Victim Rivera, Ruiz, and Dr. Grand. Petitioner did not testify.

Victim Rivera, on direct examination, largely repeated the testimony that she had provided at the earlier suppression hearing regarding when she met Petitioner, the circumstances surrounding the attack, and the extent of the injuries she sustained.  (Tr. 123-63.)  She also testified that photographs were taken of her injuries after she was released from the hospital; these photographs were admitted into evidence without

objection.  (Tr. 154-62.)  Victim Rivera once again made a courtroom identification of Petitioner.  (Tr. 127.)

On cross examination, Victim Rivera testified that she had been mistaken as to her earlier description of when she met Petitioner – she clarified that she last saw Petitioner not in January but the Halloween before the February incident.  (Tr. 182-86.)  She explained that "I must have been confused about the calculation about when I met him.  I know I met this guy."  (Tr. 182.)  She did not, however, remember how long before Halloween she had originally met Petitioner.  (Tr. 187-89.)  Even so, Victim Rivera testified that the first time she met Petitioner was in her sister's apartment, and the second time was while he and her sister were in the car together.  (Tr. 187-95.)  Victim Rivera also testified that she had mistakenly told the Grand Jury she had met Petitioner only once before; she explained that "I was confused.  Once again, I'm not good with calculations."  (Tr. 198.)  Finally, she testified that the lights on the nearby building illuminated the area of the crime.  (Tr. 208.)

Ruiz, on direct examination, likewise testified that she was present during the crime.  (Tr.  43-47.)  She described her presence at the party, how her sister was attacked, and how she called 911.  (Tr. 34-50.)  The recording of the 911 call was played for the jury and introduced into evidence over the objection of Petitioner's attorney, David Goldstein.  (Tr. 49.)  Ruiz also testified that she had interacted with Petitioner on numerous occasions and made an in-court identification.  (Tr. 34-36.)

On cross examination, Ruiz testified that she was unsure how long Petitioner and her sister had been dating.  (Tr. 55.)  Like Victim Rivera, Ruiz pointed out that there were exterior lights on the front of the apartment building where the altercation took

place, but noted that the nearby train station, which also provided lighting, was three hundred feet away.  (Tr. 77-79.)

Dr. Grand, as an expert witness, testified about the size and nature of the wounds, saying that they were consistent with a wound by knife or some type of blade, matching the complaint the patient had made.  (Tr. 305-08.)  Dr. Grand also testified that lacerations of the type Victim Rivera received always leave scars.  (Tr. 311-12.)

Petitioner himself did not testify; as would later be discovered, he fled the state in the middle of his trial. (Sentencing Transcript ("Sentencing"), Dkt. 40, 10, 24.)

**3.      Jury Encounter with Petitioner**

On Wednesday, September 12, 2012, Petitioner, while on the phone, entered the same elevator as some of the jurors.  (Tr. 279, 317.)  Juror Gonzalez (Juror Number 11) notified an officer of the court.  (Tr. 320.)  Two days later, the court held voir dires of Gonzalez, and then the other jurors, to determine whether or not they would be prejudiced against Petitioner as a result of the encounter.  (Tr. 316-69.)

The voir dires revealed that the interaction between Petitioner and the jurors was minimal and "nobody said anything" while he was in the elevator with them.  (Tr. 316-69.)  Gonzales described the situation as "kind of funny that we're trying a person, we're in the elevator and he just ran in there like that, you know.  I just felt uncomfortable." (Tr. 322.)  The following dialogue between the prosecution and Gonzales is typical of the substance of the responses given by him and other jurors:

> Zortman:  And I know they already asked you this, but to be clear, is that going to affect your ability to sit on this case?
>
> Gonzales:  Oh, no.

> Zortman: And is that going to affect your ability to maintain that the defendant is innocent until proven guilty?
>
> Gonzalez: Oh, yes.
>
> Zortman: It's going to affect you?
>
> Gonzales: No, it's not going to affect me.
>
> Zortman: I probably said that backwards.
>
> Gonzales: It's not going to affect me at all.

(Tr. 322.)

No jurors said that the encounter with Petitioner would affect their judgment in the case. (Tr. 316-69.) While Juror Dino suggested a fellow juror (Juror Colon) seemed more uncomfortable than the rest, Juror Colon denied that it would affect her ability to judge the case, saying, "No, absolutely not," when asked if the decision would affect her ability to render a fair verdict. (Tr. 326, 357.) One juror, Juror Lowe, was not asked whether or not the incident would impair her judgment or affect her ability to render a fair verdict; Lowe was not in the elevator during the incident and had only learned of the incident immediately preceding the voir dire. (Tr. 330-33.)

After the court and counsel conducted the voir dires, Petitioner's attorney made an application for a mistrial. (Tr. 369.) The court denied the motion, noting: "All the jurors indicated they could be fair and they wouldn't consider this issue. I find they were truthful and candid in what they said …." (Tr. 372-74.) The court found that any juror discomfort arose from the jurors' understanding that "they weren't supposed to be in the same place as the defendant and that made them uncomfortable or wary." (Tr. 374.)

Petitioner's attorney then asked that Juror Gonzales and Juror Colon to be excused and replaced with alternates.  After entertaining a brief argument, the court denied the application.  (Tr. 375.)

### 4.      Jury Instructions, Conviction, and Sentencing

The jury was presented with three counts: one count of assault in the first degree, and, in the event that the jury did not find sufficient evidence to convict on assault in the first degree, two counts of assault in the second degree.  (Tr. 437-41.) The court defined assault in the first degree as when a person "with intent to cause serious physical injury to another person … causes such injury to that person by means of a dangerous instrument."  (Tr. 437.)  The court defined serious physical injury as present "when a reasonable observer would find a person's altered appearance distressing or objectionable," and intent as a "conscious objective or purpose."  (Tr. 437-38.)  The jury returned a guilty verdict on the first degree assault charge.  (Tr. 454-56.)

On April 25, 2013, the court sentenced Petitioner to eighteen years in prison and five years of post-release supervision.  (Sentencing 24.)  The court explained that it determined the length of the sentence after considering the injuries sustained by the victim, as well as Petitioner's lack of remorse, flight during trial, and previous violent felony conviction.  (Sentencing 24.)

### C.    Post-Trial Appeals

Petitioner unsuccessfully challenged his conviction, first through assistance of counsel on direct appeal, and then pro se during collateral proceedings.

1.    **Direct Appeal**

Petitioner first applied to the New York State Supreme Court, Appellate Division, First Department (the "Appellate Division"), for relief, arguing that (1) the trial court erred by not making any findings of fact or conclusions of law in relation to Victim Rivera's independent basis for her identification of Petitioner, (2) the 911 call should not have been admitted into evidence, (3) the trial court should have declared a mistrial or dismissed at least one juror, (4)  the evidence presented at trial was insufficient or against the weight of the evidence, and (5) the eighteen-year sentence was excessive. (R. App. Div. Brief at 5.[5])  In Petitioner's brief, the first, third, fourth, and fifth points explicitly mention federal law.  (R. App. Div. Brief at 13, 16, 18, 20.)  Point two relies solely upon state court decisions but does mention the federal constitution.  (R. App. Div. Brief at 14-15.)

In a unanimous decision issued on October 15, 2015, the Appellate Division denied Petitioner's appeal in its entirety.  *People v. Rivera*, 132 A.D.3d 530, 530-31, 18 N.Y.S.3d 36, 37-38 (1st Dep't 2015).  The Appellate Division determined that the trial court did not err in concluding that Victim Rivera had an independent basis for identifying Petitioner, in admitting the 911 call, or in refusing to declare a mistrial or excuse any jurors.  *Id.*, 18 N.Y.S.3d at 37.  The Appellate Division also determined that Petitioner's legal sufficiency claim was unpreserved, and in the alternative was without merit, and that the eighteen-year sentence was appropriate.  *Id.* at 531, 18 N.Y.S.3d at 37-38.

---

[5] "R. App. Div. Brief" refers to Petitioner's Appellate Division Brief (Dkt. 25-1).

On October 30, 2015, Petitioner sought leave to appeal to the New York State Court of Appeals, for the most part raising the same arguments as he had on the intermediate appeal, except that he did not press the excessive sentence point. (Leave Application, Dkt. 25-4.) Nor did Petitioner dispute the Appellate Division's ruling that he had not preserved his insufficient evidence claim. (Leave Application.) On May 23, 2016, the Court of Appeals summarily denied the application for leave to appeal. *People v. Rivera*, 27 N.Y.3d 1074, 38 N.Y.S.3d 845 (2016).

### 2.    Collateral Attacks

On July 17, 2017, Petitioner filed a pro se motion in the New York Supreme Court, Bronx County to vacate his conviction pursuant to New York State Criminal Procedure Law § 440.10(1)(h), arguing that he was prejudiced by ineffective assistance of counsel. (Aff. for Mot. to Vac. ¶ 1.[6]) None of the arguments made in the § 440 motion explicitly relate to the present Petition and Petitioner does not press for habeas relief on grounds of ineffective assistance of counsel. (Aff. for Mot. to Vac. ¶ 1.) On March 29, 2019, the motion was denied without a hearing, but with a full written opinion. (Dkt. 25-10.) Petitioner then sought leave to appeal the denial of his § 440 motion to the Appellate Division.

Almost two years after filing his first § 440 motion, Petitioner filed a second § 440 motion on May 13, 2019, this time invoking the U.S. Constitution and arguing that counsel was ineffective for failing to move the court for an order of dismissal on the grounds that the victim's injuries did not amount to serious physical injury. (Dkt. 25-12 ¶ 21.) While this second § 440 motion was pending, on July 23, 2019, the Appellate

---

[6] "Aff. for Mot. to Vac." refers to Petitioner's Affidavit in Support of Motion to Vacate Judgment, dated July 17, 2017, found in Attachment C to Petitioner's Petition (Dkt. 2).

Division denied Petitioner's application for leave to appeal his first § 440 motion.  (Dkt. 25-11.)   On December 4, 2019, the New York Supreme Court denied Petitioner's second § 440 motion on the grounds that it was procedurally barred by his failure to raise the arguments presented in his previous § 440 motion and, in the alternative, that it was without merit.  (Dkt. 25-14 at 5.)

A week later, on December 10, 2019, this Court received Petitioner's timely Petition for a writ of habeas corpus.[7]  (Dkt. 2.)

### Legal Standards

The Antiterrorism and Effective Death Penalty Act ("AEDPA") provides a remedy for a state prisoner when his continued custody is in violation of federal law.  28 U.S.C § 2254(a).  Under AEDPA, an application for a writ of habeas corpus on behalf of a state prisoner "shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim" either:

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Deciding whether a state court's decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of fact requires the federal habeas court to 'train its attention on the particular reasons – both legal and

---

[7]  On July 10, 2020, the parties consented to have the undersigned conduct all proceedings in this case.  (Dkt. 33.)

factual – why state courts rejected a state prisoner's federal claims,' and to give appropriate deference to that decision." *Wilson v. Sellers*, __ U.S. __, __, 138 S. Ct. 1188, 1191-92 (2018) (first quoting *Hittson v. Chatman*, 576 U.S. 1028, 1028 (2015) (Ginsburg, J., concurring in denial of certiorari); and then citing *Harrington v. Richter*, 562 U.S. 86, 101-02 (2011)).

A state court decision is "contrary to" clearly established precedent when the state court applies a rule that is "diametrically different, opposite in character or nature, or mutually opposed" to the governing law set forth in Supreme Court cases. *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (internal quotation marks omitted) (quoting *Contrary*, Webster's Third New International Dictionary (1976)).

By contrast, "[a] court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle … but unreasonably applies it to the facts of the particular case." *Bell v. Cone*, 535 U.S. 685, 694 (2002). This inquiry focuses not on whether the state court's application of clearly established federal law is merely incorrect or erroneous, but on whether it is objectively unreasonable. *See id.* "Under § 2254(d), a habeas court must determine what arguments or theories supported or, … could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington*, 562 U.S. at 102.

AEDPA forecloses "'using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.'" *Parker v. Matthews*, 567 U.S. 37, 38 (2012) (quoting *Renico v. Lett*, 559 U.S. 766, 779 (2010)). "A state court's findings are

not unreasonable under § 2254(d)(2) simply because a federal habeas court reviewing the claim in the first instance would have reached a different conclusion." *Pine v. Superintendent, Green Haven Correctional Facility*, 103 F. Supp. 3d 263, 275 (N.D.N.Y. 2015). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

Even if a trial court error meets the standards required by AEDPA, habeas relief is not warranted unless the violation "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (confirming continued applicability of Brecht under AEDPA); *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994) ("Habeas relief is not appropriate when there is merely a 'reasonable possibility' that trial error contributed to the verdict.") (quoting *Brecht*, 507 U.S. at 637); *Butler v. Graham*, No. 07-CV-6586, 2008 WL 2388740, *6 (S.D.N.Y. June 12, 2008) (recognizing and applying "substantial and injurious effect" standard and citing *Brecht* and *Fry*).

The habeas petitioner "bears the burden of proving by a preponderance of the evidence that his constitutional rights have been violated." *Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997). The petitioner also bears "the burden of rebutting the presumption of correctness" of state court fact determinations "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Where, as here, a petitioner proceeds pro se, the court must construe his submissions liberally and interpret them "'to raise the strongest arguments that they suggest.'" *Kirkland v. Cablevision System*, 760 F.3d 223, 224 (2d

14

Cir. 2014) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).  This does not, however, excuse a petitioner "from compliance with relevant rules of procedural and substantive law."  *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983) (quoting *Birl v. Estelle*, 660 F.2d 592, 593 (5th Cir. 1981)).

AEDPA also imposes a number of threshold requirements on habeas petitioners, including that petitioners first exhaust their claims in state court.   28 U.S.C. § 2254(b)(1);  *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999);  *Galdamez v. Keane*, 394 F.3d 68, 72 (2d Cir. 2005).  The exhaustion requirement is designed to provide state courts with the "'opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" *Jackson v. Edwards*, 404 F.3d 612, 619 (2d Cir. 2005) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)); *see Galdamez*, 394 F.3d at 72-73 ("Comity concerns lie at the core of the exhaustion requirement.").  The Second Circuit has adopted the Supreme Court's warning against "interpreting this [exhaustion] provision too narrowly"; exhaustion requires "'only that state prisoners give state courts a fair opportunity to act on their claims.'"  *Galdamez*, 394 F.3d at 72 (quoting *O'Sullivan*, 526 U.S. at 844).

As a result, a petitioner need not invoke every possible avenue of state court review, but instead must "'give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.'"  *Id.* at 73. (quoting *O'Sullivan*, 526 U.S. at 845).  A "complete round" requires presenting the federal claim to the highest court of the state, which in this case is the New York Court of Appeals.  *See id.* (citing *Morgan v. Bennett*, 204 F.3d 360, 369 (2d Cir. 2000)).  Furthermore, a petitioner must have "'*fairly presented* his

claims to the state courts,' such that the state court had a fair opportunity to act." *Id.* (alteration omitted) (quoting *O'Sullivan*, 526 U.S. at 848).  Although the petitioner need not "'cite chapter and verse of the Constitution in order to satisfy this requirement,' he must tender his claim 'in terms that are likely to alert the state courts to the claim's federal nature.'"  *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (quoting *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011)).

Where a state appellate court summarily affirms a decision by the lower court, the federal habeas court "'look[s] through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "then presume[s] that the unexplained decision adopted the same reasoning."  *Wilson*, ___ U.S. at ___, 138 S. Ct. at 1192.  "[T]he State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed."  *Id.*

### Discussion

Petitioner asserts five grounds for habeas relief: (1) the trial court erred in not suppressing Victim Rivera's identification of Petitioner, which was tainted by the single photo shown to her by the police; (2) the trial court erred in admitting Ruiz's 911 call; (3) after jurors encountered Petitioner in the elevator, the court should have granted a mistrial or excused the jurors who indicated that he caused them fear or anxiety; (4) his eighteen-year sentence was unduly harsh and excessive; and (5) the prosecution failed to meet its burden of proof, or, in the alternative, the verdict was against the weight of

the evidence.  (Grounds Raised, Dkt. 2-2.[8])   As discussed below, Petitioner has not exhausted all of these claims, and, regardless, all are without merit.

## I.      Unreliable Identification Claim (Ground One) Is Without Merit

As the Government concedes, the Fourth Amendment protects defendants from identification following unduly suggestive police identification procedures.  *See United States v. Crews*, 445 U.S. 463, 473 (1980); *accord Young v. Conway*, 698 F.3d 69, 77 (2d Cir. 2009).  Convictions will only be set aside, however, when "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  *Simmons v. United States*, 390 U.S. 377, 384 (1986).

Where an identification procedure is found to be impermissibly suggestive, there must be an independent basis for the identification in order for testimony regarding the identification to be admitted.  *See Crews*, 445 U.S. at 473 (explaining that identification stemming from a previous encounter with criminal defendant was not necessarily tainted by "poison" of intervening photographic identifications); *accord Young*, 698 F.3d at 77.  To make that determination, a court considers the so-called *Biggers* factors: (1) the opportunity to view an assailant at the time of the crime, (2) the degree of attention paid to the attacker, (3) the accuracy of the description provided to police, (4) the witness' level of certainty, and (5) the time between the crime and the confrontation. *Manson v. Brathwaite*, 432 U.S. 98, 114-16 (1977) (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).  The factors are not exhaustive, and not all of the factors need to point toward reliability in order for a witness to be reliable.  *See Biggers*, 409 U.S. at 201.

---

[8] "Grounds Raised" refers to Attachment E:  Ground Raised and Supporting Fact to Petitioner's Petition.

The question thus is whether the state courts unreasonably applied *Biggers* in determining whether there was an independent basis with regard to Victim Rivera's identification testimony.   Petitioner argues that Victim Rivera did not have an independent basis because her description was inaccurate and she had an insufficient opportunity to view her attacker.  (Grounds Raised at 3.)  Considering the totality of circumstances, however, the state courts had a reasonable basis to conclude that Victim Rivera had an independent basis to identify Petitioner apart from the photo showed to her by police.  *See Biggers*, 309 U.S. at 199-201 (finding reliability after looking at "the totality of the circumstances").  Consequently, the state courts' decisions were reasonable and not contrary to or an unreasonable application of federal law.

First, as Victim Rivera's testimony during the suppression hearing reveals, she had ample opportunity to view her attacker, both before the assault and during the assault itself.   Face-to-face interactions with adequate lighting weigh in favor of admitting evidence.  *See Conner v. Poole*, 440 F. App'x 29, 31 (2d Cir. 2011) (five minutes "ample opportunity" to observe home invaders where face was visible); *see also United States v. Finley*, 245 F.3d 199, 203-04 (2001) (not clear error for district court to admit identification evidence following face-to-face interaction and then observation at a range of fifty feet under street lights and with flashlight); *Gilford v. Racette*, No. 13-CV-5881, 2015 WL 4639975, at *18 & n.25 (S.D.N.Y. Aug. 5, 2015) (collecting cases where close interactions with assailant weighed in favor of finding identification reliable; being within inches of assailant added to reliability), *R. & R. adopted*, 2015 WL 7430825 (S.D.N.Y. Nov. 20, 2015).

In this case, during the suppression hearing, Victim Rivera testified that she was within five feet of Petitioner prior to the assault and stood face to face with him during the assault itself.  (Supp. Hr'g 53-58.)  She also testified that the area where the attack took place was brightly lit by lights on the side of the building and at a nearby train station.  (Supp. Hr'g 55-56.)  Petitioner argues that the cross-examination of Victim Rivera at trial revealed that the lighting that allegedly enabled her to view her attacker "was simply not there."  (Grounds Raised at 3.)  Petitioner apparently is referring to the lights from the train station, which Victim Rivera admitted was two blocks away, but Victim Rivera reiterated that there were building lights in addition to the light coming from the train station.  (Tr. 205-06.)  Thus, Victim Rivera, coming face-to-face with Petitioner under ambient lighting, had ample opportunity to view her assailant, which points strongly toward the reliability of her identification.  Victim Rivera's encounters with Petitioner in the months before the incident only add to that conclusion.  *See United States v. Wade*, 388 U.S. 218, 241 n.33 (1967) (prior association with defendant has "an important bearing upon the true basis of the witness' in-court identification").

Second, the circumstances indicate that Victim Rivera would have paid a good deal of attention to her attacker.  Victims of crimes are more likely than bystanders to identify, and remember, the faces of assailants.  *Biggers,* 409 U.S. at 200 & n. 7 (citing *United States ex rel. Phipps v. Follete*, 428 F.2d 912, 915 (2d Cir. 1970)).  Nor is there any evidence of a substantial distraction that would have diluted Victim Rivera's attention.  *See generally Raheem v. Kelly*, 257 F.3d 122, 138 (2d Cir. 2001) (identification unreliable in part because of distractions at bar prior to robbery as well as subsequent focus on gun).  While Victim Rivera did describe her concerns about harm

to Campos, as well as the attention she paid to the knife drawn, her attention throughout, and especially while standing between Campos and Petitioner, was on Petitioner.  (Tr. 139-42.)  Victim Rivera's high degree of attention weighs in favor of the reliability of her identification.

Third, Victim Rivera's description was not so inaccurate as to preclude a finding that she had an independent basis for identifying Petitioner.  Based on testimony from a detective during the pre-trial evidentiary hearings, Petitioner argues that Victim Rivera told an officer that her attacker "was 5'10" tall and had black hair," when, at the time of the incident, Petitioner was 5'7" and had gray hair.  (Grounds Raised at 3; Supp. Hr'g 93; *Rodriguez* Hr'g 21.)  However, Victim Rivera's responses during the suppression hearing cast into doubt whether she provided that description:

> Q.  Did you tell the police officer the first day right after this happened that the person that cut you was 5 feet 10 inches tall?  Just yes or no.
>
> A.  No.
>
> Q.  Or "I don't know"?
>
> A.  No.
>
> Q.  You didn't say that?
>
> A.  No.
>
> Q.  Did you tell –
>
> A.  I just picked up my hand told him he's like about this height.  I never said nothing about no 5-10.
>
> …
>
> Q.  How tall are you?
>
> A.  Five-three.

Q.  Okay.  Did you tell the police that he had black hair?

A.  No.

(Supp. Hr'g 75.)

In short, Victim Rivera's testimony suggests that she did not provide an inaccurate description to the police.  However, even attributing the description in the police report to Victim Rivera, it is not so inconsistent with Petitioner's actual attributes as to preclude reliability.  Ruiz's testimony suggests Petitioner had "salt and pepper hair"; this is consistent with Victim Rivera's description.  (Tr. 109.)  Furthermore, "[w]itnesses' powers of observation are greater than their powers of description"; an error of three inches in height can be attributed to this difference.  *Brisco v. Ercole*, 565 F.3d 80, 92 (2d Cir. 2009) (internal quotation marks, citation, and brackets omitted) (describing powers of observation); *see also United States v. Wong*, 40 F.3d 1347, 1358-60 (2d Cir. 1994) (identification sufficiently reliable even when height estimate was wrong by seven inches).  These minor inconsistencies, in the presence of other factors indicating reliability, do not render Victim Rivera's identification unreliable.  *See Vasquez v. Poole*, 331 F. Supp. 2d 145, 159-61 (E.D.N.Y. 2004) (description did not bolster or detract from pre-trial identification where there were minor discrepancies which were roughly consistent with the ultimate identification); *see also Biggers*, 409 U.S. at 201 (finding reliability despite one factor – time between crime and confrontation – not pointing toward reliability).

Fourth, Victim Rivera's level of certainty that Petitioner was her assailant points toward reliability.  Uncertainty can take many forms: witnesses may hesitate, be unsure, or choose a suspect only after being prodded.  *Dickerson v. Fogg*, 692 F.2d 238, 246

(2d Cir. 1982).    Here, Petitioner points to no evidence in the record showing any uncertainty on Victim Rivera's part in identifying him.

Fifth, the time between the crime and confrontation (here, presentation of the single photograph) suggests that Victim Rivera's identification was reliable.    Petitioner and the Government agree the photo identification took place soon after the assault (Government MOL at 10; Grounds Raised at 3[9]); indeed, it was a period of only four days.    (*Rodriguez* Hr'g 28.)    *See Dunnigan v. Keane*, 137 F.3d 117, 129 (2d Cir. 1998) (three-day interval between crime and identification indicated reliability), *overruled on other grounds by Perry v. New Hampshire*, 565 U.S. 228 (2012); *Rock v. Conway*, No. 09-CV-3883, 2010 WL 3528871, at *3 (S.D.N.Y. Aug. 30, 2010) (reasonable for state court to find that period of three days weighed in favor of admissibility under *Biggers*), *aff'd*, 470 F. App'x 15, 17 (2d Cir. 2012); *In re McIntosh*, 491 F. Supp. 534, 537 (S.D.N.Y. 1980) ("The ten days between the time and the confrontation … is not so long a period as to suggest that the witnesses' recollection was dimmed or undependable") (internal citations omitted).

Weighing all the *Biggers* factors, this Court cannot say that the state trial court's decision to admit Victim Rivera's identification testimony was unreasonable.    Two of the factors – opportunity to observe her assailant and degree of attention paid to her attacker – weigh strongly in favor of reliability.    Two others – level of certainty and time between crime and confrontation – weigh somewhat in favor of reliability.    Accuracy of description is the only factor which arguably weighs on the side of unreliability, but given Victim Rivera's testimony during the suppression hearing about what she did and did

---

[9] "Government MOL" refers to the Government's Memorandum of Law in opposition to Petitioner's Petition (Dkt. 26).

not tell the police, this factor does not shift the balance.   At the very least, the trial court's conclusion that Victim Rivera's identification testimony was independently reliable and therefore admissible was not objectively unreasonable, and that conclusion is therefore entitled to deference on habeas review.   *See Rock*, 470 F. App'x at 17-18 (district court did not err in denying habeas relief after determining that Appellate Division was not unreasonable in finding reliability where level of certainty and prior description may have cut against in-court identification, but other *Biggers* factors suggested reliability); *see also Vazquez*, 331 F. Supp. 2d at 160-61 (denial of habeas in part because *Biggers* factors suggested reliability despite prior description and level of certainty casting doubt on reliability); *Bond v. Walker*, 68 F. Supp. 2d 287, 306-07 (S.D.N.Y. 1999) (denying habeas petition because identification was sufficiently reliable by virtue of the first, second, and fifth *Biggers* factors despite the third and fourth *Biggers* factors suggesting a lack of reliability), *aff'd*, 242 F.3d 364 (table) (2d Cir. 2000). Petitioner's claim based on the single-photograph identification thus fails.

## II.   Confrontation Claim (Ground Two) Is Without Merit

Although Petitioner has exhausted his confrontation claim, he is nevertheless ineligible for habeas relief on this ground.   He neither shows that the admission of the 911 call was against Supreme Court precedent nor persuasively points to any unreasonable determination made by the state courts.

Indeed, Supreme Court precedent weighs against Petitioner's claim.   Petitioner repeats his argument, made unsuccessfully to the Appellate Division and the Court of Appeals, that Ruiz's identification of Petitioner during her 911 call was inadmissible hearsay because "[t]he statement was made in response to the operator's question,

'what happened,'" and was "clearly testimonial." (Grounds Raised at 4-6.)  In *Davis v. Washington*, the Supreme Court considered a similar question, ultimately ruling that portions of a 911 call, admitted under Washington State's excited utterance rule and taking place during an emergency, did not produce testimonial, constitutionally inadmissible, statements.  547 U.S. 813, 819, 826-29 (2006).  The Court identified four characteristics distinguishing the call from an interrogation that would be testimonial in nature: the phone call took place while the events were happening, the call was made in the face of an ongoing emergency, questions were asked to resolve the emergency, and the tone was not that of a formal interrogation.  *Id.* at 827.  The Court found it relevant that the primary purpose of the interrogation by the 911 operator was "to enable police assistance to meet an ongoing emergency."  *Id.* at 828.

Ruiz's 911 call is analogous to the phone call in *Davis*.  Ruiz called 911 promptly after Victim Rivera was attacked, Victim Rivera was facing an ongoing medical emergency, and there is no indication that the tone approached that of a formal police interrogation.   To the contrary, according to the trial court's finding, "The caller sound[ed] hysterical.  Indeed the operator repeatedly told the caller to calm down ….  Clearly, this was an emergency." (Call Supp. Hr'g 9.)  Ruiz's statements during the call are thus best characterized as non-testimonial in nature and constitutionally admissible under New York's excited utterance exception to hearsay.   Given the exigent emergency, this remains true even considering Ruiz's identification of Petitioner in response to the question "what happened?".  *See Davis*, 547 U.S. at 827, 829 (identification in non-testimonial context does not violate Confrontation Clause).  While Ruiz, unlike the caller in *Davis*, was not the victim, Ruiz's response, like the caller's in

*Davis*, was rendered to enable emergency responders to "meet an ongoing emergency" and thus was non-testimonial in nature.  *Id.* at 828.  As a result, Petitioner has not shown that the state proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

Second, Petitioner fails to point to any decision of the state courts that was unreasonable in light of the evidence presented.  Petitioner argues that the decision was unreasonable essentially because Ruiz had time to contemplate, citing *People v. Dalton,* 88 N.Y.2d 561, 647 N.Y.S.2d 697 (1996),[10] to illustrate his point that Ruiz's statements should therefore have been held inadmissible.  (Grounds Raised at 5-6.) The trial court here, however, specifically noted that Ruiz sounded "hysterical" and that the situation "was an emergency."  (Call Supp. Hr'g 9.)  Similarly, the Appellate Division found no error in the trial court's conclusion that Ruiz was under stress during the conversation.  *Rivera*, 132 A.D.3d at 530, 18 N.Y.S.3d at 37.

Where, as here, "the statements were uttered when emotional excitement continues to dominate and the reflective powers are still in abeyance, the declaration is properly admissible."  *People v. Edwards*, 47 N.Y.2d 493, 498, 419 N.Y.S.2d 45, 48 (1979); *see also People v. Coleman*, 16 A.D.3d 254, 254-55, 791 N.Y.S.2d 112, 113-14 (1st Dep't 2005) (call featuring 911 operator requesting description properly admitted under the excited-utterance exception to hearsay due to distraught nature of caller); *People v. Marino*, 21 A.D.3d 430, 431, 800 N.Y.S.2d 439, 440-41 (2nd Dep't 2005) (911

---

[10] This case consolidates two lower court cases – *People v. Vasquez* and *People v. Dalton*.  The Court refers to the case as *People v. Dalton* because it focuses on the portion of the opinion dealing with Defendant Dalton.

tape properly admitted where operator requested and obtained description from hysterical caller).  The trial court found those conditions present here, and its findings are owed deference under AEDPA.  28 U.S.C. § 2254(d)(1).  Meanwhile, *Dalton* is distinguishable both because Dalton had a calm demeanor during his 911 call and because, as the accused, he had an exculpatory motive that cast into doubt the reliability of his statements.  *Dalton*, 88 N.Y.2d at 578-80, 647 N.Y.S.2d at 705-06 (1996).  In short, this Court cannot say the state courts' decisions were not based on "a reasonable determination of the facts in light of the evidence presented."  28 U.S.C. § 2254(d)(2).  Accordingly, Petitioner's second claim for relief is dismissed.

## III.    Biased Juror Claim (Ground Three) Is Without Merit

Petitioner claims that the trial court erred by failing to dismiss jurors or call a mistrial following his encounter with them in the elevator.  As an initial matter, errors solely of state law are not cognizable upon habeas review.  28 U.S.C. § 2254(a) (habeas review for federal claims).  To the extent that Petitioner's claim concerns the outcome of a *Buford* hearing under state law,[11] it is cognizable only on a showing, not present here, that there was a "fundamental miscarriage of justice".  *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  But Petitioner has consistently asserted that his

---

[11] *People v. Buford* lays out the relevant standards for juror disqualification under New York law and requires, when a question of juror disqualification arises, trial courts to "question each allegedly unqualified juror individually in camera in the presence of the attorneys and defendant," evaluating "the nature of what the juror has seen, heard, or has acquired knowledge of, and assess its importance and its bearing on the case." *People v. Buford*, 69 N.Y.2d 290, 299, 514 N.Y.S.2d 191, 195-96 (1987).  The trial court did exactly that and acted well within the discretion under state law, which requires substitution of jurors after jury selection only when a juror is "grossly unqualified to serve in the case."   N.Y. C.P.L.R. § 270.35; *see also Buford*, 69 N.Y.2d at 298-99, 514 N.Y.S.2d at 195-96 (emphasizing the "grossly unqualified" standard and noting that a juror should be discharged only when their inability to render an impartial verdict is obvious).

federal due process right to a fair trial by an impartial jury was violated; and to this extent, his claim lies within the realm of habeas review.  *See Ida v. United States*, 191 F. Supp. 2d 426, 431 (S.D.N.Y. 2002) ("right to a trial before an impartial jury is at the heart of the protections afforded by the Constitution").  Even so, it is without merit.

Under AEDPA, Petitioner's claim is evaluated against the Constitution and federal law.  28 U.S.C. § 2254(a).  The Constitutional "remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. 209, 215 (1982); *see also Remmer v. United States*, 347 U.S. 227, 229-30 (1954) (requiring a hearing to determine exact circumstances, impact on juror, and any resulting prejudice instead of a new trial); *but see Haxhia v. Lee*, 637 F. App'x 634, 636-37 (2d Cir. 2016) (hearing not always required to investigate prejudicial occurrences).  Petitioner received such a hearing, which consisted of examinations of each juror and argument from both sides, and concluded with the court finding that each juror remained impartial.  (Tr. 316-75.)  Having received the appropriate form of federal relief, Petitioner's complaints as to juror impartially do not demonstrate "an unreasonable application of … clearly established federal law."  28 U.S.C. § 2254(d)(1).

Petitioner nevertheless argues that the court ignored the clear fact that "both [Jurors] Gonzales and Colon had formed a specific opinion about the defendant *himself*" and therefore "the impartiality of the jury was not unambiguous."  (Grounds Raised at 10.)  The thrust of Petitioner's argument is that the jurors feared him during their encounter in the elevator, he was thereby prejudiced, and it was unreasonable for the trial court to find otherwise.  The record does not provide any support for those

assertions.  The trial judge explicitly found that the jurors were credible and that any wariness resulted from the thought that "neither one of the parties, the prosecutor, or defense lawyer, should be in an elevator with them."  (Tr. 372-74.)  Likewise, the trial court found that no jurors had formed an ultimate opinion as to Petitioner's guilt.  (Tr. 372-74.)  These findings are owed deference.  28 U.S.C. §2254(e).

The trial court's findings with respect to Jurors Colon and Gonzalez, or any other juror for that matter, were eminently reasonable.  On voir dire following the encounter, juror Colon testified:

> The Court:  Did [Petitioner entering the elevator] make you feel uncomfortable?
>
> Juror Colon:  Yes.
>
> The Court:  How come?
>
> Juror Colon:  I mean he is the defendant of the case we're the jurors, so I mean I wasn't scared, but I felt a bit uncomfortable.
>
> …
>
> Mr. Goldstein:  Not a problem.  I mean did that make you feel uncomfortable because you heard he had cut somebody?
>
> Juror Colon:  No, just that he was just the defendant of the case.
>
> Mr. Goldstein:  Okay.  So is this going to affect your ability to render a fair verdict here? You're going to hold it against him that you felt uncomfortable because he got on the elevator with you?
>
> Juror Colon:  No, absolutely not.

(Tr. 324-26.)

Juror Colon unequivocally denied that the encounter would affect her ability to render a fair verdict.  Her clear attribution of the source of her discomfort matches the trial court's understanding of the situation.  It is true, as Petitioner points out, that juror Gonzales thought that Juror Colon "was practically very afraid" and "was pretty scared." (Tr. 317.)  The court's implicit decision to disregard Gonzales' impression of Colon's emotional state in favor of Colon's own testimony, however, was within its discretion and not unreasonable.  *See Patton v. Yount*, 467 U.S. 1025, 1037-38 (1984) (On habeas review, trial court's credibility determinations are entitled to deference, so long as there "is fair support in the record for the state courts' conclusion that the jurors … would be impartial."); *see also Knapp v. Leonardo*, 46 F.3d 170, 176-77 (2d Cir. 1995) (habeas denied where, despite potential prejudice by virtue of exposure to news, jurors denied that it would preclude reaching a fair judgment at trial); *Wheel v. Robinson*, 34 F.3d 60, 64-65 (2d Cir. 1994) (trial judge's finding that there was no juror bias despite comments suggesting juror impatience owed deference in habeas proceedings where court conducted thorough review of allegations of bias).

Juror Gonzales' testimony was similar to that of Colon.  While agreeing with defense counsel that he was made uncomfortable by Petitioner's presence, he also agreed with the prosecution that this was because he understood that he was not supposed to be in contact with the person on trial.  (Tr. 319, 321.)  Furthermore, when asked whether he could remain impartial, Gonzalez reiterated that he would be able to do so and that the incident would not "affect [him] at all."  (Tr. 322.)  The trial court thus was not unreasonable in finding that Gonzales was impartial.  Petitioner thus has not

shown that the trial court's decision "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2).

In sum, Petitioner's claim based on the trial court's decision not to declare a mistrial or excuse Jurors Gonzalez and Colon does not meet the standards for habeas relief required by AEDPA.

## IV. Excessive Sentencing Claim (Ground Four) Is Unexhausted, Not Reviewable, and Without Merit

### A. Claim Is Unexhausted and Not a Federal Issue

Petitioner's fourth ground was not included in the letter attached to his application seeking leave to appeal to the Court of Appeals and is thus unexhausted. *See Galdamez*, 394 F.3d at 74; *see also Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991) ("fair import" of raising a claim in a brief but not the letter attached to application seeking certification for leave to appeal to the Court of Appeals is that the unraised claims "had been abandoned"). Federal law requires claims to be exhausted in order for habeas relief to be granted. 28 U.S.C. § 2254(b)(1). Petitioner's claim therefore is not properly before the Court.

Furthermore, even if Petitioner had alerted the Court of Appeals to his claim, his arguments seeking a discretionary reduction in the length of a sentence would nevertheless be unreviewable by this Court. "No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992), *see also Baide-Ferrero v. Ercole*, No. 06-CV-6961, 2010 WL 1257615, at *4 (S.D.N.Y. March 31, 2010) (collecting cases in which excessive sentencing was found to be not cognizable on habeas review). In this case, Petitioner was sentenced to a term of imprisonment of eighteen years as a

second violent felony offender, having committed the crime of felony assault in the first degree.  (Sentencing 24.)  This is less than the maximum sentence available under New York State law.  *See* N.Y. Penal Law § 120.10 ("Assault in the first degree is a class B felony"); N.Y. Penal Law § 70.02 subdiv. 3(a) (authorized range for a class B felony is 10 to 25 years); N.Y. Penal Law § 70.04 subdiv. 3(a) (range for violent felony offenders convicted of class B felonies is 10 to 25 years).

### B.  Cruel and Unusual Claim Is Without Merit

Even if Petitioner's claim were subject to review by this court, it is nevertheless without merit.  Petitioner has not shown that his sentence was "cruel and unusual."  *See* U.S. Const. amend. VIII.  In fact, "outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." *Rummel v. Estelle*, 445 U.S. 263, 272 (1980).  As the Supreme Court has discussed, "for crimes concededly classified and classifiable as felonies … the length of the sentence actually imposed is purely a matter of legislative prerogative."  *Id.* at 274; *but see Graham v. Florida*, 560 U.S. 48, 81-82 (2010) (Eighth Amendment violated when juvenile sentenced to life without parole for nonhomicide crime); *Miller v. Alabama*, 567 U.S. 460, 489 (2012) (legislature cannot impose mandatory life without parole for murder by juveniles without allowing for discretion based on age and nature of crimes). Petitioner's crime of assault in the first degree is well within the realm of usual felonies, and therefore his sentence, within the period prescribed by the legislature, is not disproportionate.  *Cf. Estelle*, 445 U.S. at 274 n.11 (sentencing might be disproportionate if legislature, for example, "made overtime parking a felony punishable by life imprisonment."); *compare Ewing v. California*, 538 U.S. 11, 29-30 (2003)

(plurality opinion) (sentence of 25 years to life under California's three strikes law for felony grand theft of three golf clubs is not cruel and unusual) *and Lockyer v. Andrade*, 538 U.S. 63, 66-68, 77 (2003) (not unreasonable application of clearly established federal law to affirm two consecutive sentences of 25 years to life, under California's three strikes law, for petty theft of videotapes) (2003), *with Solem v. Helm*, 463 U.S. 277, 297-303 (1983) (sentence of life imprisonment without parole under South Dakota's recidivist statute for the issuance of a "no account" check unconstitutional because of nonviolent nature of crime and relative lack of severity).  As a result, Petitioner's sentence was not so "cruel and unusual" as to justify habeas relief.

**V.     Sufficiency of Evidence Claim (Ground Five) Is Barred on State Procedural Grounds and Is Without Merit; Weight of Evidence Claim Is Not Reviewable**

**A.     Petitioner Procedurally Defaulted on His Claim**

"A procedural default occurs if the state court's rejection of a federal claim rests on a state law ground – such as the operation of a state procedural rule," so long as application of the state rule is both "independent" and "adequate." *Jackson*, 763 F.3d at 133; *Coleman*, 501 U.S. at 729 (1991). A decision is independent when it is not "interwoven with federal law" but instead "fairly appear[s] to rest primarily on state procedural law." *Jimenez v. Walker*, 458 F.3d 130, 138 (2d Cir. 2006).  If a state court judgment is based on sufficient state law grounds, it is considered independent of federal law even where the court reaches the merits of a federal claim as an alternative holding.  *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *see also Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) ("[t]here is no question that the Appellate Division's explicit invocation of the procedural bar constitutes an 'independent' state ground … even though the court spoke to the merits of Garcia's claim in an alternative holding")

(internal citations omitted).   A decision is adequate when the state procedural rule it relies upon is "'firmly established and regularly followed.'"   *Walker v. Martin,* 562 U.S. 307, 316 (2011) (quoting *Beard v. Kindler*, 588 U.S. 53, 60-61 (2009)).   The preservation requirement of New York's contemporaneous objection rule meets the adequacy requirement.   *See Downs v. Lape*, 657 F.3d 97, 103-04 (2d Cir. 2011) (collecting cases).

Under New York's contemporaneous objection rule, a "specific objection" must be presented at trial in order to challenge legal sufficiency.   *People v. Gray*, 86 N.Y.2d 10, 20-22, 629 N.Y.S.2d 173, 175-77 (1995); *see also* N.Y. Crim. Pro. Law § 470.05 (for a question of law to be preserved, parties must present such protest at the time of relevant ruling).   New York's preservation rule requires "'that any matter which a party wishes the appellate court to decide have been brought to the attention of the trial court at a time and in a way that gave the latter the opportunity to remedy the problem and thereby avert reversible error.'"   *Richardson v. Greene*, 497 F.3d 212, 218 (2d Cir. 2007) (quoting *Garcia,* 188 F.3d at 78, in turn quoting *People v. Luperon*, 85 N.Y.2d 71, 78, 623 N.Y.S.2d 735, 738-79 (1995)).

Here, the Appellate Division found that "Defendant's legal sufficiency claim is unpreserved," before going on to also reject the claim on the merits "as an alternative holding."   *Rivera*, 132 A.D.3d at 531, 18 N.Y.S.3d at 37.   The Appellate Division, writing summarily, ostensibly adopted the reasoning presented by the Government in its brief to the Appellate Division; that is, an objection more specific than a request to "reserve motions" is required in order to later raise a legal sufficiency ground.   (Government's Appellate Division Brief, Dkt. 25-2, at 35-36.)   This ruling is, in turn, justified by the fact

33

that Petitioner never submitted an objection as to the legal sufficiency of the evidence against him, despite having the opportunity to do so at his charging conference.  (Tr. 273.)  The Appellate Division's ruling reflects its understanding that Petitioner never brought his sufficiency objection "to the attention of the trial court … in a way that gave the [court] the opportunity to remedy the problem."  *Richardson*, 497 F.3d at 218 (internal quotation marks omitted).  The decision was thus made on grounds which were both independent and adequate, thereby precluding habeas review of Petitioner's sufficiency of the evidence claim.

### B.    Sufficiency of Evidence Claim Is Without Merit

In addition to being procedurally defaulted, Petitioner's sufficiency of evidence claim is without merit.  For Petitioner to prevail on his argument that the evidence presented at trial was legally insufficient to support his conviction, he must show that "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 324 (1979).  Under this rational trier of fact standard, "the only question … is whether th[e] finding was so insupportable as to fall below the threshold of bare rationality."  *Coleman v. Johnson*, 566 U.S. 650, 656 (2012).  To answer this question, the court views the record "in the light most favorable to the prosecution." *See Jackson*, 443 U.S. at 324. This standard is "applied with explicit reference to the substantive elements of the criminal offense as defined by state law."  *Id.* n.16.  Despite arguments to the contrary, Petitioner has not met his burden under *Jackson* with regard to the two contested elements, serious physical injury and intent.

Under New York law, assault in the first degree requires proof of "serious physical injury," N.Y. Penal Law § 120.10, meaning injury which "creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." N.Y. Penal Law § 10.00(10). A person is "'seriously' disfigured when a reasonable observer would find her altered appearance distressing or objectionable," but this standard is "viewed in context, considering [the] location on the body and any relevant aspects of the victim's overall physical appearance." *People v. McKinnon*, 15 N.Y.3d 311, 315, 910 N.Y.S.2d 767, 769 (2010).[12]

The evidence at trial is sufficient to shows that Victim Rivera suffered severe injury, as defined by New York law, on two distinct grounds. First, when viewed in the light most favorable to the People, the collected testimony reveals that Victim Rivera had objectionable scars on her breast and back. While Victim Rivera did not reveal the scar on her breast to the jury, the jury nevertheless saw photos of the original wounds taken shortly after she was released from the hospital (Tr. 154-62); heard Victim Rivera's testimony regarding the nature of the scars (Tr. 162-64); observed an analogous, if smaller, scar on her arm (Tr. 161); and heard expert testimony indicating that the wound was of such a nature as to leave a permanent scar (Tr. 311). And although the jury did not know the exact contours of the scar, given its intimate location, the jury could reasonably have inferred that it was objectionable. *See Workman v. Domouchel*, 175 A.D.3d 895, 896-97, 105 N.Y.S.3d 256, 258-59 (4th Dep't 2019) (jury can infer from photographs of sutured wounds that the wounds resulted in permanent

---

[12] The instructions given to the jury mirrored this law. (Tr. 437-38.)

scars; wounds in non-commonplace locations are more objectionable)*; see also People v. Gumbs,* 107 A.D.3d 548, 548, 968 N.Y.S.2d 452,453 (1st Dep't 2013) (photographs of wounds taken a week after assault, testimony of victim, and testimony of treating physician support inference of serious disfigurement); *People v. Irwin*, 5 A.D.3d 1122, 1123, 774 N.Y.S.2d 237, 238 (4th Dep't 2004) (jury could have inferred serious physical injury from need for surgery and photographs of sutured wounds).   Second, the evidence at trial justified a finding that Victim Rivera suffered impairment to the function of her breast.   Victim Rivera testified that she was unable to breastfeed due to the pain (Tr. 162), and her testimony was consistent with that of Dr. Grand, who noted that the cut was deep enough to extend to the area of the milk ducts and have nerve involvement (Tr. 306).

In sum, the jury had sufficient evidence to determine that Victim Rivera's injury qualified as "serious injury."   *Compare People v. Rosa*, 112 A.D.3d 551, 551, 977 N.Y.S.2d 250, 250 (1st Dep't 2013) (protracted impairment of health and function of bodily organ constituted serious physical injury when "victim was still experiencing pain in her wrist and back, which limited the physical activities in which she could engage"), *People v. Messam*, 101 A.D.3d 407, 407-08, 954 N.Y.S.2d 532, 533 (1st Dep't 2012) (pain in jaw while eating two years after injury constitutes protracted impairment of a bodily organ and health and thus serious physical injury),   *and People v. Corbin*, 90 A.D.3d 478, 479, 934 N.Y.S.2d 389, 390 (1st Dep't 2011) (protracted impairment of health established when gunshot victim "led a less active life than before the crime because he still suffered pain from his wound"),   *with People v. Stewart*, 18 N.Y.3d 831, 832-33, 939 N.Y.S.2d 273, 273-74 (2011) (no serious physical injury where injuries

were only "superficial," resulting scars were not "distressing or objectionable," and pain resulted only in "discomfiting" sensations detached from any protracted health impairment (internal quotation marks omitted)).

The jury was also well within the realm of reason in determining that Petitioner intended to cause serious physical injury to Victim Rivera.  Ruiz testified that Petitioner "was swinging the blade at Mary."  (Tr. 44-45.)  Victim Rivera likewise testified that while face to face with Petitioner, he punched and waved his hands at her before proceeding to cut her.  (Tr. 140-43.)  The jury could have reasonably inferred from this testimony that Petitioner intended to attack Victim Rivera and cause serious physical injury.  *See People v. Bueno*, 18 N.Y.3d 160, 169, 936 N.Y.S.2d 636, 643 (2011) ("A jury is entitled to infer that a defendant intended the natural and probable consequences of his acts").

Petitioner argues that the jury lacked a sufficient basis to find the requisite intent because the evidence shows either that he meant to attack Victim Rivera's nephew Campos, or that he was too intoxicated to form the requisite intent.  The Court agrees that the evidence could plausibly support an inference that Petitioner meant to attack Campos (Tr. 139-41), or that he was so intoxicated as to be unable to form intent (Tr. 135).  Either inference would suffice to negative intent.[13]  The evidence at trial, however, is not so overwhelming as to preclude any other plausible inferences.  In habeas review, conflicting inferences such as these are resolved in favor of the Government.  *See Jackson*, 443 U.S. at 326 (when "faced with a record of historical facts that supports conflicting inferences," the court "must presume – even if it does not

---

[13] The trial court did not provide instructions for transferred intent and instructed the jury that sufficient intoxication might show the inability to form a conscious purpose as required by law.  (Tr. 436-37.)

affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution").  First, as discussed, the jury had sufficient evidence to support the inference that Petitioner intended to attack Victim Rivera.  Second, given the sparse record regarding intoxication, the jury could plausibly have determined that there was insufficient evidence of intoxication to negative intent.  The fact that Petitioner's breath smelled of alcohol does not prove that Petitioner was intoxicated.  Petitioner thus fails to show that the jury lacked legally sufficient evidence to determine that he committed assault in the first degree.

Petitioner also argues, as an alternative to his legal sufficiency claim, that he is entitled to habeas relief on the grounds that the verdict was against the weight of the evidence.  Weight of the evidence claims, however, are not cognizable on habeas review.  *Ex parte Craig*, 282 F. 138, 148 (2d Cir. 1922), *aff'd sub nom. Craig v. Hecht*, 263 U.S. 255 (1923); *see Garret v. Perlman*, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006) (recognizing a weight of the evidence claim as purely a function of state law, for which habeas review is not available).  As a result, Petitioner's claim is not actionable and habeas relief is not warranted.  *See Sheard v. Lee*, No. 18-CV-2125, 2019 WL 5847151, at *9 (S.D.N.Y. Oct. 7, 2019), *R. & R. adopted*, 2019 WL 5810306 (S.D.N.Y. Nov. 6, 2019).

## Conclusion

Petitioner's remaining arguments, to the extent not addressed herein, have been considered by the Court and found to be without merit.  For the foregoing reasons, the petition for writ of habeas corpus is DENIED and the case DISMISSED.

SO ORDERED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: February 16, 2021
        New York, New York

Copies transmitted this date to all counsel of record.

The Clerk's Office is directed to mail a copy of this Decision and Order to Petitioner pro se at the following address and note service on the docket:

Miguel Rivera
DIN No.13-A-2087
Shawangunk Correctional Facility
P.O. Box 700
Wallkill, NY 12589